Rockingham
No. 84-504

PUBLIC SERVICE COMPANY OF NEW HAMPSHIRE &a.

v.

TOWN OF SEABROOK

July 3, 1985

*Sulloway, Hollis & Soden,* of Concord (*Eaton W. Tarbell, Jr.,* and *Margaret H. Nelson* on the brief, and *Ms. Nelson* orally), for the plaintiffs.

*Upton, Sanders & Smith,* of Concord (*Richard F. Upton* on the brief and orally), for the defendant.

BROCK, J.   The plaintiffs, all utility companies, are co-owners of Seabrook Station, a nuclear electric generating plant in the process of construction. They sought an abatement of property taxes levied against the project by the defendant town for the years 1978 through 1982, inclusive. Abatement having been denied by the selectmen, the plaintiffs petitioned the superior court pursuant to RSA 76:17 (Supp. 1983). The case was heard by a Master (*Peter V. Millham,* Esq.), who recommended that an abatement be granted. The Superior Court (*Temple,* J.) approved the master's recommendation, and the town appealed.

The principal issues before us are: (1) whether the master erred when he ruled that the plaintiffs' cost of obtaining money for construction, or AFUDC, was not "sufficiently tied to the value of the real estate" to be included as part of the plant's value for tax purposes; (2) whether certain items of office equipment, spare parts, building materials, and construction equipment were properly excluded from the master's computation of the plant's value; and (3) whether the master erred in his computation of a "discount factor,"

*i.e.,* a reduction in his assessment of the property's value "by a percentage intended to offset the uncertainties involved in purchasing an uncompleted plant, including the uncertainties as to the cost of completion, the time of completion, whether or not the plant will be completed, and what items may or may not be included in the rate base."

For the reasons which follow, we reverse and remand the case to the superior court on the first issue, and affirm on the second and third.

## I. *AFUDC*

Allowance for funds used during construction, or AFUDC, is a designation used in the Uniform System of Accounts prescribed by the Federal Energy Regulatory Commission, 18 C.F.R. pt. 101, at 312–13 (1984). Because it is impossible to say precisely which money borrowed by a utility, or obtained through equity financing, is used in a particular project, AFUDC has been developed as a mechanism by which to approximate the actual costs of financing a project like Seabrook Station. *See id.*

In this State, a utility may not recover amounts allocated to AFUDC from its ratepayers while construction is in progress, but may do so when the project is completed and generating electricity. *See Appeal of Public Serv. Co. of N.H.,* 122 N.H. 919, 920, 451 A.2d 1321, 1322 (1982). Because the plant here was under construction during all of the tax years in dispute, the question before the master was whether AFUDC should be considered part of the plant's value for property tax purposes during those years.

Under our construction of the taxing statutes, "[taxable] value is the market value, or the price which the property will bring in a fair market, after reasonable efforts have been made to find the purchaser who will give the highest price for it." *Company v. Gilford,* 67 N.H. 514, 517, 35 A. 945, 946–47 (1894), *quoted in Public Service Co. v. New Hampton,* 101 N.H. 142, 146, 136 A.2d 591, 595 (1957).

In *New Hampton,* we recognized the difficulty of determining the market value of property owned by a public utility, especially when the utility has a legal monopoly on the business for which the property can most profitably be used. *Id.* We noted, however, that in such cases a court could view the owner as a hypothetical buyer, *id.* at 146–47, 136 A.2d at 595, whose idea of a fair purchase price would depend largely on "the price [it] would have to pay for building a new equivalent plant." *Id.* at 147–48, 136 A.2d at 596.

All of the parties here, and the master, agreed that this "cost approach," or a variant of it, was the appropriate method of determining market value for purposes of this case. The master found that:

> "there is some cost of money involved in the construction of any building, and to the extent that the builder has been at least as efficient as the average other builder, the average cost of money during the construction phase of any building is included in the cost of that building and in its resale value to some degree."

We cannot reconcile this finding of fact by the master with his refusal to include any part of the accrued AFUDC in his assessment of the plant's value. That refusal was based in part on the master's concern that an inclusion of AFUDC would result in a higher evaluation of an inefficiently built plant, due to high financing costs, than of an efficiently built one, with lower financing costs.

The concern was well placed, but the court's conclusion was too drastic. The master had already acknowledged that any large construction project would involve some cost of financing that could properly be included in its taxable value. The evidence at trial could support a finding that, for a typical nuclear generating plant, that cost would be extremely large.

The court then should have determined how much AFUDC a typical utility, or group of utilities, would reasonably expect to have accumulated on each of the tax assessment dates in question, when constructing a plant of the same size and type as Seabrook Station, with a builder of average efficiency. This amount, added to the other costs of construction, represents the price that a hypothetical buyer would expect to pay "for building a new equivalent plant," and is thus the proper valuation amount under the rule of *New Hampton*.

For example, if the court finds on remand that a typical group of utilities in the plaintiffs' position would reasonably have expected the project to be completed before 1982, that fact should be reflected in the property's valuation for the later tax years.

Our decision in *Appeal of Public Service Company of New Hampshire*, 122 N.H. 919, 451 A.2d 1321 (1982), does not require a different result. In that case, we refused to recognize AFUDC as "income" for purposes of the franchise tax, former RSA chapter 83-B, current version at RSA chapter 83-C (Supp. 1983), because it did not "have any economic value to the franchise for rate purposes." *Appeal of Public Serv. Co. of N.H., supra* at 923, 451 A.2d at 1324. As we have repeatedly held, "the market value of a public utility for

property tax purposes is not limited to the value placed on it for rate-making purposes." *New England Power Co. v. Littleton,* 114 N.H. 594, 603, 326 A.2d 698, 704 (1974) (citing *New Hampton,* 101 N.H. at 149, 136 A.2d at 597).

■ Whether AFUDC will eventually be included in the rate base of the plaintiff utilities is not directly relevant here. Under the cost approach, which we agree is appropriate in this case, the proper question is how much AFUDC a buyer in the plaintiffs' position would normally expect to accumulate during construction. That is the question the court should address on remand.

II. *Exclusion of Items*

· The dispute in this area concerned both the scope of RSA 72:6 and the meaning and legislative history of RSA 72:8. From 1951 until 1967, the latter statute read:

"Lands, dams, canals, water power, pipe lines, buildings, structures, machinery, dynamos, apparatus, poles, wires, fixtures of all kinds and descriptions owned, *operated and employed by any one other than [a] municipal corporation in* generating, producing, supplying and distributing electric power or light, or in transporting natural gas, crude petroleum and refined petroleum products or combinations thereof, shall be taxed as real estate in the town in which said property or any part of it is situated."

Laws 1951, 111:1 (emphasis added).

The law took its present form in 1967, when it was amended to read as follows:

"Structures, machinery, dynamos, apparatus, poles, wires, fixtures of all kinds and descriptions, and pipe lines owned by a person or corporation operating as a public utility as defined in RSA 362:2 generating, producing, supplying and distributing electric power or light, or in transporting natural gas, crude petroleum and refined petroleum products or combinations thereof, shall be taxed as real estate in the town in which said property or any part of it is situated."

Laws 1967, 139:1.

The master in essence ruled that the deletion of the words "operated and employed . . . in," before the phrase "generating, producing, supplying and distributing electric power or light," did not change the meaning of the statute. He found that the legislature intended the latter phrase to modify "structures, machinery, etc."

rather than "person or corporation." He accordingly ruled that any items of property not actually to be used in "generating, producing, supplying and distributing" electricity could not be taxed as real estate.

In arguing for the correctness of the master's interpretation, the plaintiffs allege that "[t]he legislature's decision to eliminate the clause 'operated and employed in' can be seen as no more than simplification and editorial streamlining . . . ." This is not a reasonable explanation, particularly in view of the twisted syntax in the amended statute. The deletion must have had some other purpose.

■ "When construing an ambiguous statute, this court looks to both the legislative intent and the objectives of the legislation." *Greenhalge v. Town of Dunbarton*, 122 N.H. 1038, 1040, 453 A.2d 1295, 1296 (1982). The meager legislative history of the 1967 amendment suggests that the purpose of deleting "operated and employed" was to ensure that a generator would be taxable if it was in a utility's plant, even though it was temporarily out of service. *See* N.H.S. JOUR. 234–35, 492–93 (1967). Unless some such construction were intended, the deletion could have no practical purpose.

■ We accordingly reject the master's interpretation of RSA 72:8. We believe that the legislature's intent here, as in a similar statute referring to "machinery," was to subject to tax "certain instruments of production or machines which by their nature are designed for use in connection with real estate whether or not they are part of or attached to the realty." *Kolodny v. Laconia*, 96 N.H. 337, 339, 76 A.2d 507, 508 (1950) (knitting machines taxable under R.L. 73:8 (1942)).

In this case, the 1967 amendment to RSA 72:8 extended the statute's scope to include items that were not actually "operated and employed . . . in generating, producing, supplying and distributing" electricity. The amendment's context and history, however, make it clear that the legislature was concerned solely with items that have some intimate connection with the *business* of generating, producing, supplying, and distributing electricity. *Cf. King Ridge, Inc. v. Sutton*, 115 N.H. 294, 299, 340 A.2d 106, 110 (1975) (ski lifts taxable as real estate due to intimate connection with use of land as ski resort).

■ Thus, while a computer essential to the plant's efficient operation might be taxable, other office equipment would not be. In this case, none of the disputed items could have been found to be taxable under RSA 72:8, since none of them were intimately connected with the primary use of the land as an electric generating plant. We

accordingly hold that the master's excessively narrow construction of the statute did not result in reversible error.

■ The town argues that many disputed items should have been deemed taxable as fixtures under RSA 72:6, citing the doctrine of constructive annexation described in *Dana v. Burke*, 62 N.H. 627, 629 (1883). On this record, however, we cannot say that the master was compelled to find in the disputed items sufficient "adaptation to the enjoyment of the land and localization in use," *id.* (quoting EWELL ON FIXTURES 24 (1876)), to establish constructive annexation. There was no evidence that the office equipment, spare parts, and building materials in question were not "equally useful and adapted for general use elsewhere." *Dana, supra* at 629 (quoting EWELL, *supra* at 22).

III. *Discount Factors*

■ The plaintiffs and the town agreed that, for at least some of the years in question, the assessed value of the plant should be reduced by a factor reflecting the uncertainty of an eventual return on the owners' investment. For each of the five years, the factor adopted by the master was between those proposed by the plaintiffs and by the town, respectively:

|      | Plaintiffs | Town | Master |
|------|-----------|------|--------|
| 1978 | 43%       | 0%   | 25%    |
| 1979 | 45        | 0    | 32     |
| 1980 | 36        | 26   | 30     |
| 1981 | 42        | 26   | 35     |
| 1982 | 35        | 22   | 30     |

The record contains ample evidence of uncertainty about the Seabrook project in each of the five years under consideration. We cannot say that the factors adopted by the master were erroneous as a matter of law, *see New England Power Co. v. Littleton*, 114 N.H. at 599, 326 A.2d at 701, and we accordingly affirm the court's decision in that respect.

IV. *Other Issues*

The master's report, while finding that the plaintiffs' inventory for 1978 had been filed with the town in a timely fashion, failed to address the town's argument that the inventory was incomplete when filed. The court should consider this question on remand.

We need not address the question whether the master erred in failing to rule specifically on the parties' requests for findings of fact and rulings of law. Insofar as any such failure concerned the

issues remanded to the superior court, any errors can be corrected there.

*Affirmed in part; reversed in part; remanded.*

All concurred.